IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

COLLEY FISHER,

      Plaintiff,

v.

THE CITY AND COUNTY OF DENVER,
DENVER FIRE DEPARTMENT, a Political Subdivision,
SHANNON ANTHONY BERUMEN, Individually,
JOE GONZALES, Individually,
PETER VANDERMILLER, Individually
TODD BOWER, Individually,
ERIC TADE, Individually,
JESSE VIGIL, Individually.

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff, Colley Fisher, through her counsel, the law firm of Benezra & Culver, P.C., for her Complaint and Jury Demand alleges the following:

## I. INTRODUCTION

      1.     Plaintiff Colley Fisher, is a former, long-term and highly regarded employee of the Denver Fire Department ("DFD").  Throughout her career, Plaintiff Fisher was subjected to a pattern and practice of gender discrimination.  In 2015, Plaintiff Fisher was disciplined and terminated because of her gender and complaints of gender discrimination.  Arising from those facts, Ms. Fisher has brought claims for

gender discrimination and retaliation in violation of Title VII of the 1964 Civil Rights Act, as amended, violation of Equal Protection pursuant to 42 U.S.C. § 1983, tortious interference with contract, and breach of contract.

## II. JURISDICTION AND VENUE

2.      Jurisdiction is proper in this judicial district because Plaintiff Fisher is alleging violations of her rights under 42 U.S.C. § 2000(e) and 42 U.S.C. §§ 1983 and 1988.  Jurisdiction over the state law claims is made pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events or omissions giving rise to Captain Fisher's claims occurred within the jurisdiction of the United States District Court for the District of Colorado.

4.      Plaintiff Fisher has complied with all of the administrative, jurisdictional, and legal prerequisites for the filing of this action.  Specifically, Captain Fisher has filed two charges of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination and retaliation.  She has received right to sue letters from the EEOC on both charges.  Additionally, Plaintiff Fisher filed two timely notices of claim under the Colorado Governmental Immunity Act.

## III. PARTIES

5.      Plaintiff Colley Fisher is a resident of Denver, Colorado.

6.      Defendant the City and County of Denver is a municipal entity.  DFD is operated by the City and County of Denver.

7.      Defendant Shannon Anthony Berumen was a Division Chief with DFD at all relevant times.  Defendant Berumen resides within the District of Colorado.  Plaintiff Fisher is suing Mr. Berumen in his individual capacity only.

8.      Defendant Joe Gonzales was a Division Chief with DFD at all relevant times.  Defendant Gonzales resides within the District of Colorado.  Plaintiff Fisher is suing Defendant Gonzales in his individual capacity only.

9.      Defendant Peter VanderMiller was an Assistant Chief with DFD's Internal Affairs Department at all relevant times.  Plaintiff Fisher is suing Defendant VanderMiller in his individual capacity only.

10.     Defendant Eric Tade was DFD's Fire Chief at all relevant times. Defendant Tade resides within the District of Colorado.  Plaintiff Fisher is suing Defendant Tade in his individually capacity only.

11.     Defendant Todd Bower was a Deputy Chief with DFD at all relevant times. Defendant Bower resides in Colorado.  Plaintiff Fisher is suing Defendant Bower in his individual capacity only.

12.     Defendant Jess Vigil was the Deputy Manager of Safety for the City and County of Denver at all relevant times.  Plaintiff Fisher is suing Defendant Vigil in his individually capacity only.

## IV. GENERAL ALLEGATIONS

13.     After a six year career in law enforcement, Plaintiff Colley Fisher commenced her employment with DFD as a firefighter on March 1, 1992.  She was employed by DFD in various capacities from that date until she was illegally terminated

on June 10, 2015.  At the time of her termination, Colley Fisher held the position of

Captain.

14.     DFD is, and always has been, an extremely male oriented employer with

an extremely male dominated culture.  For decades, DFD has made its ranks

unwelcome to women.  Even as women have made significant strides in other settings,

DFD has remained steadfast in its efforts to limit the ability of women to succeed in its

training program and be accepted as firefighters.  Even women who succeed within the

Department are held to a higher standard than their male counterparts and are

prevented from obtaining promotions and other advancement opportunities for which

they are qualified.

15.     Denver did not hire its first female firefighter until 1985.  According to the

year 2000 U.S. Census Bureau statistics, as of that year, female firefighters comprised

just 4.02% of the workforce at DFD, even though the available workforce percentage for

the Denver Metro area was 50.58 % for women.

16.     Based on that census data, in 2007, the City's Diversity and Safety Task

Force recommended that the DFD implement an affirmative action program which used

the gender of an applicant as a plus factor when choosing among similarly qualified

applicants.

17.     DFD did not follow its own diversity recommendations.  Five years later,

as of 2012, DFD's mostly male workforce was still so closed to diversity that it continued

to garner both internal and public criticism.  The 2012 demographic breakdown of the

DFD revealed that in the upper ranks of DFD its Chief was a male, five of six Division Chiefs were male, and below that level all 32 Assistant Chiefs were men.

18.     In an internal letter, Rex King, then DFD's Deputy Chief, expressed his concern and dismay that DFD was failing to promote diversity within its ranks and were consistently promoting white males over qualified females.

19.     In a case decided by the United States Court for the District of Colorado in 2013, the Court relied on the testimony of Charles McMillian, a retired Division Chief, who testified that women were made to feel unwelcome by DFD.

20.     As of 2015, when Ms. Fisher was fired, things had not improved.  Now thirty years after DFD hired its first female firefighter, women still comprise just over 4% of the workforce.

21.     Female employees of the DFD are terminated at a significantly higher rate than are men.  Female employees are terminated for infractions that do not lead to the termination of male employees.

22.     Despite those obstacles, and being held to a higher standard than her male counterparts, Colley Fisher had a highly successful career with DFD.  At all times, her performance was fully satisfactory or better.  During her tenure, she received awards, accolades, and promotions.

23.     From March 1, 1992, until 1997, Colley Fisher served as a Firefighter and was promoted during that period from Firefighter Four to the position of Firefighter One. On October 16, 1997, she was promoted to the position of Technician/Arson Investigator.  On February 2, 1998, she was promoted to Engineer.  Colley Fisher and

another female were promoted on the same day and were the Department's very first female Engineers.

24.     Colley Fisher eventually became a high level leader within the Department. On June 6, 1999, she was promoted to the position of Lieutenant. On June 1, 2005, she was promoted to the position of Captain.

25.     Colley Fisher served as a Captain until her termination in 2015.

26.     As a Captain, Colley Fisher was the second highest ranked woman in the entire Department. As of her termination, of the roughly sixty-eight Captains who work for DFD, only three were women.

27.     On November 12, 2006, Captain Fisher was ordered to participate in an extremely dangerous and unauthorized training exercise. During the exercise, Captain Fisher suffered a severe injury to the discs in her neck. That injury left Captain Fisher permanently limited and in chronic pain. Since that date, she has been required to take medicine to control the pain, including periodically consuming Vicodin.

28.     On a number of occasions after that injury, Captain Fisher informed DFD administrators that she was taking pain medicine, including Vicodin, to control the pain caused by her workplace injury.

29.     On March 7, 2011, Captain Fisher was transferred to the Fire Prevention Division under the Supervision of Division Chief Joseph Gonzales. She worked in that position until the date of her termination.

30.     Captain Fisher's first assignment under Division Chief Gonzles was a Captain's assignment over Institutions. The position included more duties than were

performed by the previous Captain, such as teaching an emergency management medical facility safety officer class.  Nonetheless, Captain Fisher's performance was exemplary.

31.     When Assistant Chief Steve Linquist retired, Division Chief Gonzales chose her over another Captain to perform the DFD Fire Prevention, Assistant Chief duties.  When a third Captain was assigned to DFD Fire Prevention, he was assigned to Captain Fisher's prior position over Institutions.  However, he was not requested to, nor did he perform as many of the same tasks as required of Captain Fisher.   When the Third Captain transferred out of the DFD Fire Prevention Bureau, Assistant Chief Steve Ellis was assigned.  Assistant Chief Ellis was given Captain Fisher's previous position over Institutions, a Captain's position. Captain Fisher continued to perform the Assistant Chief's job without the benefit of any training, a pay increase, or promotion in rank.

32.     Division Chief Gonzales has a history of mistreating women employed by DFD.  He is often insulting and condescending to female employees.  He has repeatedly made female administrative employees cry because of his hostile treatment. Chief Gonzales does not treat men the same way.

33.     Additionally, Division Chief Gonzales treated the other male Captains under his supervision more favorably than Captain Fisher.  On a number of occasions, he simply overlooked serious mistakes by those Captains.  That favor was never extended to Captain Fisher.  Division Chief Gonzales also treated Captain Fisher less favorably than male employees with respect to compensation, promotional opportunities, and training.

34.     In the summer of 2013, Captain Fisher was erroneously accused of failing to submit a timely and accurate report regarding an employee's workplace injury.  The charges were eventually determined to be unfounded.  In the context of the Internal Affairs ("IA") investigation regarding that complaint, on November 7, 2013, Captain Fisher complained to Ashley Kilroy, the City's Manager of Safety, and the final decision-maker regarding all DFD personnel matters, that "I have been tormented for years, as have many other women and minorities."  Kilroy neither investigated nor took remedial action in response to Captain Fisher's allegations.  Division Chief Gonzales later learned about her complaint and was quite upset by it.

35.     On or around January 6, 2014,  Division Chief Gonzales placed Captain Fisher on a Performance Improvement Plan ("PIP").  The PIP was based on a series of erroneous allegations regarding her job performance.  For example, Chief Gonzales claimed that Captain Fisher was "missing in action" during her ten hour shifts.  That allegation is absolutely untrue.  During the dates in question, Captain Fisher was performing Department business and was always available by cell phone.

36.     The PIP imposed on Captain Fisher did not follow Department policy. Captain Fisher was told to keep the PIP a secret.  As a result, Captain Fisher was not given an opportunity to grieve or appeal the PIP under City policy.

37.      Even though Captain Fisher requested and 30 and 60 day re-evaluation meeting as required by the PIP, Division Chief Gonzales refused to meet with her and told her she was doing fine. In April of 2014, Division Chief Gonzales told Captain Fisher that she was "off of the PIP."  At that time, he stated that he was pleased with her

performance and promised to write a letter to that effect.  That letter was never provided to Captain Fisher.  Despite his representations, Division Chief Gonzales subsequently and repeatedly insinuated that she was still on the PIP.

38.     During a work shift on September 18, 2014, Captain Fisher was rear-ended while driving a DFD vehicle.  The other driver was issued a ticket by an officer of the Denver Police Department ("DPD") for following too closely behind her.  Although there was some damage to the DFD vehicle, it was still drivable.

39.     When Assistant Chief Robert Murphy arrived on the scene, he told Captain Fisher that he would drive her back to DFD headquarters.  Instead, he drove her to the employee medical clinic without first calling the "OUCH" line in violation of Executive Order 94.  He then ordered her to submit to a drug and alcohol test pursuant to Executive Order No. 94.  None of the circumstances identified in that Order that permit the drug and alcohol testing of a DFD employee were present.

40.     A cursory drug and alcohol test was administered.  The test came back positive for opioids, although that was later confirmed to have been a false positive.  At the time, Captain Fisher explained to Assistant Chief Murphy that the first test must have been a false positive, because the only drug she took on a periodic basis was Vicodin for her neck injury.  She told him that she had not taken Vicodin for several days prior to the accident.

41.     Because Captain Fisher was upset that she had been forced to take a drug test in violation of DFD policy, she asked a physician at the Denver Health Clinic to send her home for the rest of the day.  In a return to work pass, the physician indicated

that she could return to work the next day.  Nonetheless, when she brought that

paperwork to DFD Headquarters, as required by Department policy, she was told that

she had already been placed on administrative leave by Division Chief Anthony

Berumen.

42.     Division Chief Berumen treats male employees more favorably than

female employees.  He is generally supportive of male employees and is generally not

supportive of female employees.

43.     When Captain Fisher brought the return to work pass to DFD

Headquarters as required, she met with Division Chief Tony Berumen.  She asked him

why she had been placed on administrative leave.   In response, she was told that it

was "just precautionary" and that the whole thing would be cleared up by Monday,

September 22, 2014.  He then gave her the keys to a DFD loaner vehicle to use to drive

home while her assigned vehicle was being repaired.

44.     The Denver Health Clinic subsequently performed a more comprehensive

drug test than had been originally used.  The results of that test confirmed that Captain

Fisher tested negative for all substances, including opioids.  Even though DFD was

provided with those test results as early as September 22, she was not released from

administrative leave until October 2, 2014.

45.     When she returned to work on October 2, Captain Fisher requested a

meeting with Fire Department Chief Eric Tade.  During that meeting, Captain Fisher

stated that she wanted to file complaints against Division Chiefs Gonzales and Berumen

for harassment and creating a hostile work environment based on sex.  Division Chiefs

Gonzales and Berumen subsequently learned about Captain Fisher's complaint and were very upset that she had brought such a complaint.  No remedial action was ever taken against Division Chiefs Gonzales or Berumen for their discriminatory treatment of Captain Fisher.

46.     Captain Fisher's complaint was assigned to Jane Cisneros, Human Resources Manager for the City's Department of Safety for investigation.  Ms. Cisneros immediately discussed Captain Fisher's complaint with Division Chief Berumen.

47.     On October 16, 2014, Chief Berumen sent an email to Assistant Chief Steve Ellis to let him know that Captain Fisher's alcohol and drug testing had come back negative.  In the email, he disclosed the fact that Captain Fisher was taking Vicodin and stated that she should be allowed to take it as necessary as long as she did not operate a Department vehicle.  That assertion was inaccurate.  In reality, Captain Fisher had provided Division Chief Berumen with a copy of a prescription which indicated that she had no driving restrictions.

48.     On October 28, 2014, Captain Fisher met with Ms. Cisneros.  In that meeting, Captain Fisher again asserted that Division Chiefs Gonzales and Berumen had been discriminating against her on the basis of her sex.  She also stated that they were retaliating against her for those complaints.

49.     During this time period, and in retaliation for her complaints of discrimination, Captain Fisher was denied overtime opportunities that she had previously been permitted.  She was also stripped of her responsibilities as

commanding fire officer at Sports Authority Field at Mile High.  Loss of that responsibility alone cost Captain Fisher approximately $17,000 per year in overtime.

50.     On November 24, 2014, Captain Fisher sent an email to Department Chief Tade in which she complained that Division Chief Gonzales had been retaliating against her since she filed her complaint of discrimination.  Department Chief Tade did nothing to remediate the discriminatory and retaliatory treatment of Captain Fisher.

51.     On December 2, 2014, or just eight days after submitting her retaliation complaint, Captain Fisher was placed on investigative leave by Assistant Chief of Internal Affairs, Defendant Peter VanderMiller, and DFD Internal Affairs Lieutenant Kathleen Vrendenburg.  She was placed on that leave based on erroneous accusations made by Berumen and Gonzales.

52.     Assistant Chief VanderMiller and Lt. Vredenburg notified Captain Fisher that she was being placed on administrative leave while she was in the office at work.  When asked, VanderMiller and Vredenburg were unable to explain why she was being placed on leave.  VanderMiller and Vredenburg then monitored her as she retrieved her purse from her desk and took her personal belongings out of her DFD vehicle.  While armed with a service revolver, Vredenburg escorted Captain Fisher out of the building.  This was apparently done to embarrass Captain Fisher.  Captain Fisher is not aware of any other DFD employee being subjected to such treatment.

53.     In a subsequent conversation, Lt. Vrendenburg told Captain Fisher that, among other things, she did not believe that DFD was "open to women."

54.    On December 31, 2014, after a cursory and wholly inadequate investigation, Ms. Cisneros notified Captain Fisher by letter that she was unable to substantiate her allegations of discrimination and retaliation.

55.    On February 11, 2015, Assistant Chief VanderMiller and Lt. Vrendenburg delivered to Captain Fisher two Contemplation of Disciplinary Actions ("CODAS"), numbers 033-2014 and 034-2014. Until she received the CODAS, she had not been told what charges were being brought against her or specifically why she had been placed on administrative leave. Captain Fisher was ultimately terminated based on these CODAS.

56.    When Assistant Chief VanderMiller delivered the CODAS to Captain Fisher at her house, he could not stop smiling broadly and dramatically and when asked why, he said he's just a happy guy, that's just how he is.

57.    At no point in time, was Captain Fisher interviewed by IA, nor by any other person at DFD about the allegations in the CODAS. Its failure to do so, violated DFD's rules, custom and policy for internal investigations.

58.    The issues raised in the CODAS were either wholly untrue or significantly exaggerated. Those CODAS were being issued to Captain Fisher because of her gender and in retaliation for her complaints of discrimination and retaliation.

59.    One of the primary allegations contained in the CODAS was that Captain Fisher had failed to comply with Division Chief Berumen's order that she not drive on September 18, 2014, after her automobile accident. That allegation is false. Not only

did Division Chief Berumen not give her such an order, he actually gave her the keys to a replacement car to drive home.

60.     In the CODAS, DFD also asserted that Captain Fisher had violated Department policy by failing to disclose to her supervisors that she occasionally took pain medicine, including Vicodin.  That allegation is also untrue.  On numerous occasions, Captain Fisher informed her superiors that she was taking pain medication. Additionally, DFD policy only requires that officers disclose the fact that they are taking medicine while on duty which impairs their performance.  None of the medicines prescribed to Captain Fisher impaired her performance.

61.     In the CODAS, DFD claimed that Captain Fisher had been dishonest in denying that she had received Division Chief Berumen's order and in claiming to inform her supervisors about her medication use.  Because of those allegations, Captain Fisher submitted to a polygraph test on those issues and others.  The polygraph confirmed that Captain Fisher was telling the truth.  The results of that polygraph test were presented to DFD, which promptly ignored them.  DFD has, however, relied upon polygraph results in other contexts, including in its hiring procedures.

62.     On October 26, 2015, Assistant Chief VanderMiller, Department Chief and Defendant Eric Tade, and Deputy Chief and Defendant Todd Bower conducted the first of two pre-disciplinary hearings to address the CODAS.  Division Chief Berumen and City Attorney Jennifer Jacobsen were permitted to observe the hearing through one-way glass from an adjoining room.  Even though Captain Fisher complained that Division Chief Berumen had a conflict of interest, given her discrimination and retaliation

complaints, Division Chief Berumen remained in attendance.  However, Division Chief

Berumen was subsequently forced to recuse himself from further participation in the

disciplinary proceedings.

63.     Because Captain Fisher had not been provided with complete copies of

the CODAS prior to the first disciplinary hearing, she requested and was granted an

opportunity for a second pre-disciplinary hearing.  In granting that second hearing, DFD

added more charges against Captain Fisher.  Each of those charges were known to

DFD before the first pre-disciplinary meeting.

64.     On March 4, 2015, DFD issued an amended CODA, no. 033-2014 with

additional charges added.  On March 16, 2015, DFD issued another amended CODA,

No. 034-2014.  In that amended CODA, DFD alleged that Division Chief Berumen had a

meeting with her on October 1, 2014, in which she had supposedly been advised about

several issues surrounding the automobile accident, testing, and driving.  That

allegation was significant as the purported meeting occurred before Captain Fisher's

October 2, 2014, discrimination complaint.  The CODA further alleged that Captain

Fisher had received a memo from Division Chief Berumen confirming that October 1

meeting.  However, no such meeting occurred.  Captain Fisher was not provided a copy

of the referenced memo until March 23, 2015.

65.     The after-the-fact, manufactured October 1, 2015, memo asserts that

Division Chief Berumen had left a voicemail for Captain Fisher instructing her to come

back to work from being placed on administrative leave post-accident and to meet with

Division Chief Berumen to discuss only the accident and testing.  That assertion is

untrue and Captain Fisher has the voicemail recording to prove it.  In the course of her disciplinary appeals, she advised Department Chief Tade and Deputy Chief Todd Bower that she had that recording, but they did not care to listen to it.

66.    In late March, a second pre-disciplinary meeting was conducted by Department Chief Tade and Deputy Chief Bower.  During that meeting, Defendants Tade, Bower, and VanderMiller asserted that they had proof that Captain Fisher had gone to the Roslyn repair shop on September 18, 2014, and had signed a log in book and gassed up another vehicle at the Roslyn location against Division Chief Berumen's orders.   When Captain Fisher denied this allegation and asked to see her signature on the log and for verification of where the vehicle had been fueled, it turned out that neither, Tade, nor Bower, nor VanderMiller investigated the matter.  When an investigation was conducted, it was discovered that Captain Fisher did not sign a log in book and the vehicle that Division Chief Berumen had given Captain Fisher the keys was not fueled at the Roslyn location but at the Jason location.  Additionally, one of the witnesses had issued two completely contradictory reports about whether they had driven a vehicle from the repair shop to DFD Headquarters on the day of Captain Fisher's accident for her to drive.

67.    During the second pre-disciplinary hearing, Department Chief Tade, Deputy Chief Bower, and Assistant Chief VanderMiller treated Captain Fisher with extreme hostility in contravention of DFD Policy.

68.    After the second pre-disciplinary hearing, Department Chief Tade, Deputy Chief Bower, and Assistant Chief VanderMiller recommended that Captain Fisher be

terminated.  They did so even though they knew that the allegations raised in the

CODAs were untrue, exaggerated, and brought because of Captain Fisher's gender and

in retaliation for her discrimination complaints.

69.     After this hearing, Captain Fisher requested that Division Chiefs Berumen

and Gonzales be investigated for untruthfulness and fabricating evidence.  No formal

investigation was ever conducted.

70.     On June 10, 2015, Captain Fisher learned that she had been terminated.

Her termination had been approved by Deputy Director of Safety Jess Vigil. Before he

issued his decision, Vigil failed to conduct an independent investigation of the

allegations against Captain Fisher. In contravention of his own practice, Vigil did not

even speak with Captain Fisher about the allegations against her.  He also ignored

information in his possession that suggested that the CODAs were exaggerated, untrue,

and initiated because of her gender and in retaliation for her complaints of

discrimination.  Vigil simply deferred to the untruthful statements of Division Chiefs

Berumen and Gonzales, Department Chief Tade, Division Chief Bower, and Assistant

Chief VanderMiller.

71.     Male DFD employees have committed violations significantly more serious

than those allegedly committed by Captain Fisher and yet were not fired.   For example,

in the last few years alone, men in positions comparable to Captain Fisher's solicited

prostitutes, engaged in criminal trespass, engaged in acts of violence with other DFD

employees, assaulted a police officer, engaged in poaching, engaged in disorderly

conduct, abandoned a crew at a fire, were convicted for driving under the influence

involving accidents, committed assaults, committed a kidnapping, bullied a crew, displayed a firearm while off duty in an act of road rage, discharged a firearm for no reason while off duty, tested positive for drug and alcohol use while on duty, stole prescription drugs, and ignored a safety issue that lead to the death of a Denver Firefighter.   All of these actions either violate Department policy or Colorado criminal law or both.  These offenses were significantly more serious than those allegedly committed by Captain Fisher.  Nonetheless, the male employees were not terminated.

72.     Since Plaintiff Fisher's improper termination, DFD has continued to discriminate and retaliate against her.  For example, in violation of Article XVIII, Section 6 of the DFD Collective Bargaining Agreement, and despite repeated requests, DFD has refused to pay Plaintiff Fisher her accrued sick and vacation time.

73.     As a result of Defendants' illegal conduct, Captain Fisher has suffered significant wage and benefit loss, as well as significant emotional distress.

74.     Defendants' misconduct was willful and wanton and taken with reckless disregard for Captain Fisher's rights and feelings.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Sex Discrimination in Violation of Title VII
### (Against DFD)

75.     Plaintiff hereby incorporates Paragraphs 1 through 74 as though fully alleged herein.

76.     As a woman, Captain Fisher is a member of a protected class.

77.     Plaintiff Fisher was subjected to adverse actions, including being subjected to a hostile work environment, being denied overtime opportunities, and being disciplined and terminated based on false accusations.

78.     Captain Fisher was treated less favorably than her male counterparts.

79.     The adverse actions taken against Captain Fisher were motivated by her gender.

80.     As a result of Defendants' discriminatory conduct, Captain Fisher has suffered damages.

### SECOND CLAIM FOR RELIEF
### Retaliation in Violation of Title VII
### (Against DFD)

81.     Plaintiff hereby incorporates Paragraphs 1 through 80 as though fully alleged herein.

82.     Captain Fisher engaged in protected activity by complaining of sex discrimination and retaliation.

83.     Plaintiff Fisher was subjected to adverse actions, including being subjected to a hostile work environment, being denied overtime opportunities, and being disciplined and terminated based on false accusations.

84.     Captain Fisher was treated less favorably than employees who did not engage in protected activity.

85.     The adverse actions taken against Captain Fisher were motivated by her gender.

86.    As a result of Defendants' discriminatory conduct, Captain Fisher has suffered damages.

### THIRD CLAIM FOR RELIEF
### Violation of Equal Protection Pursuant to 42 U.S.C. § 1983
### (Against All Defendants)

87.    Plaintiff hereby incorporates Paragraphs 1 through 86 as though fully alleged herein.

88.    Plaintiff is a member of a protected class based upon her sex, pursuant to the Equal Protection clause off the Fourteenth Amendment of the United States Constitution.

89.    Defendants deprived Plaintiff Fisher of her constitutionally protected rights when they intentionally and recklessly acted to deny her equal protection under the law based upon gender.

90.    Defendant's discrimination against Plaintiff Fisher includes subjecting her to a hostile work environment, denying her benefits including overtime opportunities, and subjecting her to bogus discipline and the termination of her employment.

91.    Defendants' acts as described herein were engaged in maliciously or with callous disregard to Plaintiff Fisher's protected rights.

92.    The aforementioned conduct represents the official custom, policy or practice of the Defendant DFD.

93.     Defendants' conduct violated clearly established rights of the Plaintiff for which reasonable persons in the Defendants position knew or should have known.

94.     As a result of the Defendants' unlawful conduct, Plaintiff Fisher has suffered damages, including lost wages, lost benefits, compensatory damages, including damages for emotional distress, punitive damages against the individual Defendants and has incurred attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF
### Tortious Interference with Contract
### (Against the Individually Named Defendants)

95.     Plaintiff hereby incorporates Paragraphs 1 through 94  as though fully alleged herein.

96.     Plaintiff Fisher had an employment contract with DFD.

97.     Defendants knew that Plaintifif Fisher had such a contract and/or had knowledge of facts which reasonably should have caused them to know of the contract.

98.     Defendants, with this knowledge, intentionally and improperly induced the third Parties to breach the contract by terminating her employment.

99.     Defendants' misconduct was willful and wanton.

## FIFTH CLAIM FOR RELIEF
### Breach of Contract
### (Against DFD)

100.    Plaintiff hereby incorporates Paragraphs 1 through 99 as though fully alleged herein.

101.    DFD and Colley Fisher entered into an employment agreement in which Defendant promised Ms. Fisher a payment of her accrued sick and vacation time upon her termination.

102.    Defendant DFD breached that agreement by refusing to pay out Colley Fisher's sick and vacation time.

103.    Defendant's breach was willful and wanton.

WHEREFORE Plaintiff Fisher respectfully requests that this Court enter judgment in her favor and against the Defendants an award

(a)    injunctive and declaratory relief;

(b)    damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, lost promotions, and other employment opportunities;

(c)    an order for the Defendant to reinstate Plaintiff Fisher or in the alternative to pay front-pay and benefits, including lost benefits in an appropriate amount;

(d)    compensatory damages, including emotional distress as allowed by law;

(e)    punitive damages as allowed by law;

(f)    attorney's fees and costs as provided for by law;

(g)    pre- and post-judgment interest, costs, expert witness fees; and

(h)    such other relief as the Court deems just and proper.

**PLAINTIFF FISHER REQUESTS A TRIAL BY JURY
ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this **14th** day of **July** , 2016.

s/
**John A. Culver, Esq.**
**Seth J. Benezra, Esq.**
**Adam W. Ray, Esq.**
Benezra & Culver, P.C.
633 17th St., Suite 1310
Denver, CO  80202
Telephone: (303) 716-0254
FAX: (303) 716-0327
E-mail: sjbenezra@bc-law.com
Email: jaculver@bc-law.com
Email: awray@bc-law.com
Attorney for Plaintiff

Plaintiff's Address
6800 W. Princeton Ave.
Denver CO  80235